(COMMON LAW.)

MOREAN v. THE UNITED STATES INSURANCE COMPANY.

The insurer on *memorandum articles*, is only liable for a total loss, which can never happen where the cargo, or a part of it, has been sent on by the insured, and reaches the original port of its destination.

Where the ship being cast on shore near the port of destination, the agent of the insured employed persons to unlade as much of the cargo (of corn) as could be saved, and nearly one half was landed, dried, and sent on to the port of destination, and sold by the consignees at about one quarter the price of sound corn; this was held not to be a total loss, and the insurer not to be liable.

ERROR to the circuit court for the district of Pennsylvania. This was an action commenced by the plaintiff in error, upon a policy of insurance dated the 14th of December, 1812, on goods on board the brig Betsey, at and from Cape Henry to Lisbon, at a premium of six per cent., on which 5,000 dollars were underwritten by the defendants, and valued at that sum, declared to be against all risks, except British capture, warranted American property. The jury found a verdict for the plaintiff, subject to the opinion of the court upon the following facts agreed by the parties. The cargo consisted of 4,406 bushels of indian corn, 100 barrels of navy bread, and 20 barrels of corn meal. The brig sailed from Baltimore on the 11th of November, 1812, and from Cape Henry on the 13th of the same month. She experienced, on the voyage, many and severe gales of

wind. On the 18th of December, she passed the rock of Lisbon, and came to anchor about four miles below Belem Castle. She leaked considerably in consequence of the injury she had sustained from the severe gales to which she had been exposed. After passing the rock the wind died away, and the current being adverse, she came to anchor. The master and supercargo landed, went through the customary forms at Belem to obtain a permit to pass the castle, and then proceeded to Lisbon. The health boat visited the brig, and ordered her to get above the castle as soon as possible. On the 19th, she was again exposed to a heavy and fatal gale, and drove ashore near to Belem Castle, the sea breaking over her, and the crew hanging by the rigging to preserve their lives. The supercargo considered both vessel and cargo as totally lost. By directions of the custom house, as much of the cargo as could be got out, was unladen by a number of French prisoners who were employed for that purpose. The cargo was all wet, and the part of it which was then taken out was carried to the fort, where it was spread and dried. From thence it was carried to Lisbon in lighters, and was sold in the corn market by the consignee of the cargo. The quantity so saved and sold amounted to about 1,988 bushels, which was sold at 50 cents a bushel, whereas the price of sound corn was 2 dollars and 25 cents a bushel. The supercargo petitioned for liberty to sell the corn at the place where it was first deposited and dried, which could not be granted, and he was obliged to submit to the custom of the place, and allow it to be sold at the corn mar-

ket. The brig was so completely wrecked, that she was sold, with her materials, where she lay, in lots. Had the supercargo been left to the free exercise of his own judgment, he would not have attempted to save any part of the cargo, in consequence of the total damage, and the great expense of saving it. The net proceeds of the cargo were not much more than the expenses of saving it, including those of the supercargo. The port of Lisbon commences above Belem Castle, and the custom of the place is to discharge cargoes of corn between that castle and Cantara, which latter place is from one to two miles below Lisbon. The vessel never arrived at her port of discharge. On the 22d of December she was entered at the custom house by the American vice consul, which he said was necessary; but port dues do not attach to vessels till they pass the castle. Still, as part of the cargo was carried to Lisbon, the entry was made by the consul, and the dues were paid. On the 11th of March, 1813, the plaintiff, having received notice of the shipwreck, offered to abandon, which was refused. Upon these facts, the circuit court gave judgment for the defendants, and the cause was brought by writ of error into this court.

*Pinkney,* for the plaintiff. By the shipwreck, and breaking up of the voyage, the plaintiff was entitled to abandon; and there is no distinction in law in this respect between memorandum articles and general articles. The wreck disabled the ship from transporting the commodity, and the insured was not

1816.

Morean
v.
The U. S.
Ins. Co.

1816.

Moreau
v.
The U. S.
Ins. Co.

obliged to find another vehicle to carry it on. Here more than a moiety of the thing insured was annihilated, to say nothing of the deterioration of the rest. By the contract, it became the duty of the agent of the insured, to labour about the thing; and, if the wreck and consequent damage justified the right of abandonment, what effect can the conduct of the supercargo have? The subsequent transportation can have no effect on the right of abandonment: the supercargo was compelled to carry it on by the Portuguese government for the supply of the capital. The law holds, that the insured shall not abandon in the case of memorandum articles upon *deterioration* merely. This is not a mere technical total loss; it is the same thing as if the waves of the sea had washed this portion of the cargo up to Lisbon. The usage of the government, in compelling a sale in such cases, must have been equally known to both parties, and ought to operate equally on both.

*Harper*, contra. 1. A distinction is here attempted to be taken, on account of the nature of the peril by which the loss was occasioned. But the law prescribes, that the insured must carry on memorandum articles, if possible, in another vehicle. No degree of injury, short of total destruction, will justify the insured in abandoning without making an effort to carry on the articles; and their actual arrival at the port of destination, no matter how, prevents abandonment.[a] Our policies contain no stipulation simi-

---

[a] *Marshall on Insurance*, Condy's ed. 223. and the cases there cited.

lar to those in the English, as to " stranding of the ship," in the case of memorandum articles. Wreck cannot help the insured, where the consequence is the destruction of the *voyage* only, without the actual destruction of the *thing*. The right of abandonment exists, while the peril of total loss exists; but when the article is saved from that peril, the right no longer exists.[b] 2. The right of abandonment was not exercised in due time; not until after the peril had ceased. Memorandum articles may be abandoned while they are submerged, or the hand of the enemy is upon them; but here the loss of the voyage was repaired by other means found to carry on the goods before the abandonment is made.[c] They were transported, not by violence, but according to the usage of the country; and the parties must be considered in law as having assented to this usage.

*Pinkney*, in reply. If the insured was not obliged to carry on the commodities, and he would have had a right to abandon at the time, nothing subsequent has devested it. The sole object of the memorandum clause is to exempt the insurer from liability for deterioration only, and the reason was the inherent tendency of these articles to decay. The destruction of the vehicle, and the destruction of the greater part of the things transported, justified

[b] 1 *Caines' R.* 211. Magrath & Huggins v. Church. 3 *Caines' R.* Neilson et al. v. The Columbian Insurance Co. 9 *Johns. R.* Sheiffelin v. The New-York Insurance Co. 2 *Camp. N. P. Cases,* 623. Wilson v. The Royal Insurance Co. 7 *East,* 88. Anderson et al. v. The Royal Insurance Co.
[c] Ibid.

1816.

Morean
v.
The U. S.
Ins. Co.

the abandonment. None of the cases cited apply to this case ; and the insurer knew of the usage as well, as the insured. If this case be determined not to be a case justifying abandonment, on account of the saving of so small a part, what case of abandonment of memorandum articles can exist? The abandonment was in time, because made in good faith, and as soon as the insured knew of the peril.

March 11th.

WASHINGTON, J., delivered the opinion of the court, and, after stating the facts, proceeded as follows :

All considerations connected with the loss of the cargo, in respect to quantity or value, may, at once, be dismissed from the case. As to memorandum articles, the insurer agrees to pay for a total loss only, the insured taking upon himself all partial losses without exception.

If the property arrive at the port of discharge, reduced in quantity or value, to any amount, the loss cannot be said to be total in reality, and the insured cannot treat it as a total, and demand an indemnity for a partial loss. There is no instance where the insured can demand as for a total loss that he might not have declined an abandonment, and demand a partial loss. But if the property insured be included within the memorandum, he cannot, under any circumstances, call upon the insurer for a partial loss, and, consequently, he cannot elect to turn it into a total loss. These principles are clearly established by the case of Mason v. Skurray,[d] Neilson

d At. N. P. 1730. Park. 116. Marshall, Condy's ed. 223.

v. The Columbian Insurance Company,[e] Cocking v. Frazer,[f] M'Andrews v. Vaughan,[g] Dyson v. Rowcroft,[h] and Magrath and Huggins v. Church.[i] The only question that can possibly arise, in relation to memorandum articles, is, whether the loss was total or not; and this can never happen where the cargo, or a part of it, has been sent on by the insured, and reaches the original port of its destination. Being there specifically, the insurer has complied with his engagements; every thing like a promise of indemnity against loss or damage to the cargo being excluded from the policy. If the question turn upon the totality of the loss, unconnected with the subject of loss by deterioration of the cargo in value, or reduction in quantity, there is no difference between memorandum and other articles. If the loss be total in reality, or is such as the insured is permitted to treat as such, he is entitled to abandon and recover as for a total loss in the case of memorandum articles, but always with this exception, that he is not permitted to turn a partial, into a total loss. Keeping this distinction in view, the loss of the voyage by capture, shipwreck, or otherwise, may be treated as a total loss. This is the doctrine in the case of Dyson v. Rowcroft, in which the right to abandon was placed, not upon the ground of deterioration of the cargo, but upon the justifiable necessity which resulted from it of throwing the cargo overboard:

1816.

Morean
v.
The U. S.
Ins. Co.

e 3 *Caines' Rep.* 108.   f *Park*, 114. *Marshall*, 227., Condy's ed.
g *At. N. P.* 1793. *Ib.*   h 3 *Bos. & Pul.* 474.   i 1 *Caines'
Rep.* 196.

this was, in effect, the same thing as if it had, in a storm, been swept from the deck. Such, too, was the case of Manning v. Newnham.[j]  In Cocking v. Frazer no such necessity existed, and the breaking up of the voyage was attempted to be justified by the damaged state of the cargo, which, *per se*, did not justify the insured in putting an end to the voyage, and thus to turn a partial loss, for which the insurer was not liable, into a total loss. Magrath and Huggins v. Church establishes the same doctrine. Now, what is the present case? The ship being thrown on shore, within a mile or two from her port of destination, the agent of the insured employs persons to unlade as much of the cargo as could be saved, and nearly one half was, by his exertions, landed, dried, and sent to the market at Lisbon, and sold by the consignees at about one quarter the price of sound corn, leaving a very inconsiderable sum for the owner, after paying the expenses. Is not this precisely the case of Neilson v. The Columbian Insurance Company, and Anderson v. the same,[k] with this difference only, that in the first case the insured declined sending on the corn, when he might have done so, and, consequently, he was not permitted to turn a partial into a total loss by his own neglect; and, in the latter case, part of the cargo having been rescued from the wreck, before the offer to abandon was made, the insured could not claim as for a total loss, either on account of the injury which

*j Park*, 169.  *k 3 Caines' Rep.* 108.

the corn had sustained, or of his own act in not sending it forward to its port of destination. In the case now before the court, the cargo which was saved was sent forward and sold at the port of its destination.

In addition to the cases above referred to, the cases of Biays *v.* the Chesapeake Insurance Company,[l]

*l* February Term, 1813. This was an insurance on hides, "warranted by the assured free from average, unless general." The declaration was for a total loss by perils of the seas; but it appeared in evidence that 3,288 hides (the whole number insured being 14,565) were put on board of a lighter, to be transported from the vessel to their place of destination; that the lighter, on the passage to the shore, was sunk, by which accident 789 of the hides, of the value of 4,000 dollars, were totally lost, and the residue, to the number of 2,491, were fished up and saved at the expense of 6,000 dollars, which were paid by the insured. The hides, thus saved, were delivered to his agent, and sold on his account. The whole sum insured on the cargo was 25,000 dollars. In delivering the opinion of the court, it was remarked by LIVINGSTON, J., that whatever might have been the motive to the introduction of this clause in policies of insurance, which was done as early as the year 1749, and, most probably, with the intention of protecting insurers against losses arising solely from a deterioration of the article by its own perishable quality, or whatever ambiguity might once have existed, from the term *average* being used in different senses, that is, as signifying *a contribution to a general loss*, and also a *particular or partial injury* falling on the subject insured, it was well understood at the present day, with respect to such articles, that underwriters are free from all partial losses, of every kind, which do not arise from a contribution towards a general average. It only remained, then, to examine, (and so the question had been properly treated at the bar) whether the hides which were sunk, and not reclaimed, constituted a total or partial loss, within the meaning of this policy. It had been considered as total by the counsel for the insured, but the court could not perceive any ground for treating it in that way.

1816.

Moreau
v.
The U. S.
Ins. Co.

and Marcardier *v.* the same,[m] in this court, are strongly applicable to the present, and seem, in a

inasmuch as out of many thousand hides which were on board, not quite 800 were lost, making in point of value somewhat less than one sixth part of the sum insured. If there were no *memorandum* in the way, and the plaintiff had gone on to recover, as in that case he might have done, it was perceived at once that he must have had judgment only for a partial loss, which would have been equivalent to the injury actually sustained. But, without having recourse to any reasoning on the subject, the proposition appeared too self evident not to command universal assent, that when only a part of a cargo, consisting all of the same kind of articles, is lost in any way whatever, and the residue (which in this case amounted to much the greatest part) arrives in safety at its port of destination, the loss cannot but be partial, and that it must forever be so as long as a part continues to be less than the whole. This, then, being a particular loss only, and not resulting from a general average, the court was of opinion that the defendants were not liable for it.

*m* February Term, 1814. This was an action on a policy of insurance for 31,000 dollars, upon any kind of lawful goods on board

the brig Betsey, on a voyage from New-York to Nantz. The cargo was of the invoice value of 29,889 dollars, of which 7,439 dollars were in memorandum articles. The brig sailed on the voyage, but was compelled, by stress of weather, and other accidents, to bear away for the West Indies, and arrived at Antigua, where the master applied to the court of vice-admiralty for a survey; upon which the cargo was landed, and ordered by the court to be sold for the benefit of the concerned. Under this sale the net proceeds of the cargo amounted to 13,767 dollars, and of the memorandum articles to 6,863 dollars. The vessel was repaired within a reasonable time, and capable of performing the voyage with the original cargo, but the master abandoned the voyage at Antigua. Of the cargo, 99 bags of coffee were spoiled and thrown overboard, and the residue greatly damaged by the perils of the seas; and the whole cargo, including the memorandum articles, sustained a damage during the voyage, exceeding a moiety of its original value. Within a reasonable time after receiving information of the loss, the plaintiff abandoned the whole cargo to the underwriters. The plaintiff contend-

great measure, to settle it. But it is contended, by the counsel for the plaintiff, that if the loss be such

ed that he was entitled to recover as for a total loss of the cargo insured, including the memorandum articles. STORY, J., who delivered the opinion of the court, stated, that a technical total loss might arise from the mere deterioration of the cargo, by any of the perils insured against, if the deterioration be ascertained at an intermediate port of necessity short of the port of destination. In such case, although the ship be in a capacity to perform the voyage, yet, if the voyage be not worth pursuing, or the thing insured be so damaged and spoiled as to be of little or no value, the insured has a right to abandon the projected adventure, and throw upon the underwriter the unprofitable and disastrous subject of insurance. It had, therefore, been held, that if a cargo be damaged in the course of the voyage, and it appear that what has been saved is less in value than the amount of the freight, it is a clear case of a total loss. It did not, however, appear, that the exact quantum of damage which shall authorize an abandonment as for a total loss, had ever become the direct subject of adjudication in the English courts. The celebrated *Le Guidon*, c. 7. art. 1., considers that a damage exceeding the moiety of the value of the thing insured, is sufficient to authorize an abandonment. This rule had received some countenance from more recent, elementary writers ; and from its public convenience and certainty, had been adopted as the governing principle in some of the most respectable commercial states in the union, and was now so generally established as not easily to be shaken. 1 *Johns. Cas.* 141. 1 *Johns. Rep.* 335. 406. *Marshall on Insurance,* 562. note 92. Condy's edit. *Park,* 194. 6th edit. But this rule has been deemed not to extend to a cargo consisting wholly of memorandum articles. The legal effect of the memorandum is to protect the underwriters from all partial losses ; and, if a loss by deterioration, exceeding a moiety in value, would authorize an abandonment, the great object of the stipulation would be completely evaded. It seems, therefore, to be the settled doctrine, that nothing short of a total extinction, either physical or in value, of memorandum articles, at an intermediate port, would entitle the insured to turn the case into a total loss, where the voyage is capable of being performed. And, perhaps, even as to an extinction in value, where the commodity specifically remains, it might yet be deemed not quite settled, whether, under

1816.

Morean
v.
The U. S.
Ins. Co.

as that the insured might at one time have treated it as total, it continues to be so, unless at the time the like circumstances, it would authorize an abandonment for a total loss. The case before the court was of a mixed character. It embraced articles of both descriptions; some within, and some without, the purview of the memorandum. If, in such a case, a deterioration exceeding a moiety in value, be a proper case of technical total loss, it will follow, that, in many cases, the underwriter will indirectly be rendered responsible for partial losses on the memorandum articles. Suppose, in such a case, the damage to the memorandum articles were 40 per cent., and to the other articles 10 per cent., in the whole amounting to half the value of the cargo, the underwriter would be responsible for a technical total loss, and thereby made to bear the whole damage, from which the memorandum meant to exempt him. Indeed, cases might arise in which the damage might exclusively fall on memorandum articles; and, if it exceeded the moiety in value of the whole cargo, might load him with the burthen of a partial loss, in manifest contravention of the intention of the parties. A construction leading to such a consequence could not be admitted unless it be unavoidable; and the court were entirely satisfied that such a construction ought not to prevail. The underwriter is, in all cases of deterioration, entitled to an exemption from partial losses on the memorandum articles; and, in order to effectuate this right, it was necessary, where a technical total loss is sought to be maintained, upon the mere ground of deterioration of the cargo, at an intermediate port, to a moiety of its value, to exclude from that estimate all deterioration of the memorandum articles. Upon this principle, in a cargo of a mixed character, no abandonment for mere deterioration in value, during the voyage, could be valid, unless the damage on the non-memorandum articles exceeded a moiety of the whole cargo, including the memorandum articles. The case was considered, as to the underwriter, the same as though the memorandum articles should exist in their original sound state. In this way, full effect was given to the contract of the parties. The underwriter would never be made responsible for partial losses on memorandum articles, however great; and the technical total losses for which alone he could be liable, were such as stood unaffected by the perishable nature of the commodity which he insures. Admitting, therefore, the rule to be correct, that the party has a

when the offer to abandon is made clear of the effects of the peril, and in a condition to prosecute the voyage, it is restored to his possession. Now, this is certainly not the condition of property, which, at the time of the offer to abandon, is in the possession of a recaptor, who has a right to retain it until he is paid his salvage. But, in the present case, the corn never was out of the possession of the agents of the insured, who exercised every act of ownership over it, subject, nevertheless, to the laws and customs of the country to which it was sent, with which the insurer and insured are supposed to have been acquainted at the time they entered into this contract, and to which they impliedly agreed to submit. The cargo which was landed, not only continued in the possession, and under the direction, of the agents of the insured, but it was relieved from the effects of the peril, as between the insurer and insured, and it was not only in a condition to prosecute the voyage, but it did in reality complete it. Upon the whole, it is the opinion of the court that this is not such a loss as the defendants engaged to indemnify against, and that judgment should be given in their favour.

Judgment affirmed."

1816.

Morean
v.
The U. S.
Ins. Co.

right to abandon when the depreciation exceeds a moiety of the value, the plaintiff had not brought himself within that rule, as applied to a cargo of a mixed nature, and there was, consequently, no total loss proved by the perils of the seas.

n We are informed by *Targa*. c. 52. n. 18. p. 230, and *Casaregis, Disc.* 47., that in the practice of Italy, in order to avoid the difficulty of settling averages on perishable articles, the clause *excluso getto et avaria*, as it was called, was introduced. The

French law requires goods, which, by their nature, are subject to particular detriment or diminution, such as grain, salt, or merchandise subject to leakage, to be specified in the policy, otherwise the insurer is not liable for the damages or losses which may happen to these articles, unless the insured was ignorant of the nature of the cargo at the time the contract was made. *Ordonnance de la Marine*, l. 3. tit. 6. *des Assurances*, art. 31. *Code de Commerce*, l. 2. tit. 10. art. 355. In the different ports of France, before the revolution, various clauses were inserted in the policy, excluding responsibility for losses not exceeding a certain per centage on such articles. At Marseilles the insurers exempted themselves from average losses, on certain voyages, by a clause which was construed to extend both to general and particular average, on vessel or cargo. Under this clause *franc d'avarie*, the insurer was held answerable only for an entire loss of the subject insured. It was, however, determined not to extend to any case of technical total loss, which by the French law authorizes the insured

to abandon, such as capture, stranding, shipwreck, &c. 1 *Emerigon, Traité des Assurances*, c. 12. s. 45, 46. *Pothier d'Assurance*, No. 166. *Valin sur l'Ordonnance*, l. 3. tit. 6., *Des Assurances*, art. 47. The origin of the English *memorandum* is referred by Sergeant Dunning, in the case of Wilson et al. v. Smith, 3 *Burr.* 1551, to its "being better calculated to deliver the insurers from small averages, than adapting the premium to the nature of the commodity, as it might happen to be more or less liable to perish or suffer; which method would have made the policy too complicated, and which the *Dutch* had at first tried, but afterwards altered." The English formula is as follows: "N. B. Corn, &c., are warranted free from average, &c., unless general, or the ship be stranded." The last words, *or the ship be stranded*, have been omitted for several years in the forms of policies adopted by the English insurance companies, viz. the London Royal Assurance, and the Royal Exchange Assurance. 2 *Selwyn's N. P.* 949. They are not inserted in the policies used in the United States.