WASHBURN & MOEN MFG. CO. v. RELIANCE MARINE INS. CO.[1]

(Circuit Court, D. Massachusetts. June 14, 1895.)

No. 356.

1. FEDERAL COURTS—FOLLOWING STATE DECISIONS—CONSTRUCTION OF INSURANCE CONTRACT.

Where the construction of a policy of marine insurance depends on questions of general commercial law, the federal courts are not bound by the decisions of the courts of the state in which the contract was made, but by those of the supreme court of the United States.[2]

2. MARINE INSURANCE—CONSTRUCTION OF POLICY.

A policy of marine insurance contained the usual memorandum clause, by which certain enumerated articles, including wire of all kinds and steel, were "warranted by the assured free from average, unless general." It also contained a rider reading: "Free of particular average, but liable for absolute total loss of a part, if amounting to 5 per cent." Held, that the memorandum clause and rider were in pari materia, and, construed together, they exempted the insurer from liability for particular average as to all articles covered by the policy, whether or not they were within the enumeration of the memorandum.

3. SAME—CONSTRUCTIVE TOTAL LOSS.

Under the terms of such a policy there can be no recovery for a constructive total loss; nor can there be any claim for an absolute total loss of the entire cargo insured, where a large part of it, transshipped by the insurer after disaster to the vessel, reaches the port of destination in specie, and a substantial portion uninjured.

4. SAME—CONSTRUCTIVE ACCEPTANCE OF ABANDONMENT—TRANSSHIPMENT BY INSURER.

Where a marine insurer of a cargo, liable only for an absolute total loss, after a disaster to the vessel which prevented completion of the voyage, and after the salved portion of the cargo had been landed at an intermediate port, in large part uninjured, acting under the sue and labor

---

[1] Note by the Court. The facts in this case sufficiently appear in Washburn & Moen Mfg. Co. v. Reliance Marine Ins. Co., 179 U. S. 1, 21 Sup. Ct. 1, 45 L. Ed. —, where this opinion was substantially affirmed.

[2] State laws as rules of decision, see notes to Griffin v. Overman Wheel Co., 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; and Hill v. Hite, 29 C. C. A. 553.

clause of the policy, transshipped the same to the port of destination, its action cannot be construed as an acceptance of abandonment, especially when it had expressly refused to accept such abandonment.

## Action at Law on a Marine Policy of Insurance.

Carver & Blodgett, for complainant.
Lowell, Stimson & Lowell, for defendant.

PUTNAM, Circuit Judge (orally). This was, undoubtedly, a Massachusetts contract. It was delivered in this state by the agent of the defendant company, and, clearly, it is within Equitable Life Assur. Soc. v. Clements, 140 U. S. 226, 11 Sup. Ct. 822, 35 L. Ed. 497. So far, therefore, as any local usages which have become a part of the subject-matter of underwriting marine risks in Massachusetts are concerned, this court would be bound to adopt the law as established by the decisions of the state court; yet, so far as a question comes up which is not one of mere local usage, but of general law, or a question of the interpretation of a commercial instrument, like a policy of insurance, although what we are seeking to discover is, of course, the law in Massachusetts, yet nevertheless we are not governed by the decisions of the courts of Massachusetts, but by those of the supreme court of the United States, so far as we can find decisions bearing on the questions involved, and, so far as we do not find them, by the general trend of authority.

There have been cited two cases—Marcardier v. Insurance Co., 8 Cranch, 39, 3 L. Ed. 481, and Morean v. Insurance Co., 1 Wheat. 219, 4 L. Ed. 75—where it was held, directly and positively, that underwriters are not liable for a constructive total loss on articles contained in the usual memorandum clause. So far as counsel have been able to inform us, and so far as we have been able to find, the supreme court has never modified the position which it took in those cases. It apparently approved it in Hugg v. Insurance Co., 7 How. 605, 12 L. Ed. 834. The rule is an exceptional one, and against the general principles of underwriting. Nevertheless, not only are we bound by these decisions of the supreme court, but the rule established by them has been recognized as law by all text-book writers in the United States. Phil. Ins. (Ed. 1867) §§ 1615, 1767, lays down the rule positively as given by the supreme court. Strange to say, in this, the last edition, the author takes no notice whatever of the Massachusetts decisions. The rule was so recognized in Maine by Chief Justice Shepley, who, as judge and as lawyer, had a large practical knowledge of marine insurance. This was in 1850, in Williams v. Insurance Co., 31 Me. 455. It is there accepted as the undoubted rule.

The plaintiff relies on Kettell v. Insurance Co., 10 Gray, 144, and Mayo v. Insurance Co., 152 Mass. 172, 25 N. E. 80. The line of reasoning in these cases is entirely unsatisfactory. Perhaps it seems absurd for this court to question Chief Justice Shaw's line of reasoning, but even Homer sometimes nodded. If he had followed out the line of reasoning which he evidently started on (that is, had attacked the entire rule found in the decisions of the supreme court, as con-

trary to the underlying rules with regard to the construction of marine policies, and had repudiated those cases entirely), there would be some very strong reasons in that behalf. But instead of doing this he undertook to make a distinction between articles found in a memorandum clause proper and articles found in a rider. So far as we can see, there is no reason in this. Moreover, the policy in issue in this case meets the supreme judicial court of Massachusetts fully, so far as that court has actually decided the question. That court undertook to make a distinction between the articles found in a memorandum clause proper and articles in a rider, but the policy at bar shows the subject-matter of this suit to be covered into the memorandum clause itself.

It is true that it is not clear that every article of the invoice in suit was covered by the memorandum clause. It enumerates only wire and steel; but any doubt is met by the rider, which obviates any question of that sort. For this case the rider is evidently in pari materia with the memorandum clause, and must bear the same construction.

Now, then, comes the question of the transshipment by the underwriters of this cargo from Key West to Velasco. The cargo was in entire safety at Key West; it was at a place where it could have been sold; it was within the reach of the owners by telegraph and otherwise; and the question arises whether the underwriters, by meddling with the cargo at Key West, and transshipping it to Velasco, made themselves liable, either by what may be regarded as an acceptance of an abandonment, or by a conversion of the property.

We apply to this case, in its fullest length and breadth, what was said by the circuit court of appeals for this circuit in Monroe v. Insurance Co., 3 C. C. A. 280, 52 Fed. 777, as follows:

"Undoubtedly the underwriters may so deal with property in peril as to convert what otherwise would be a partial loss into an absolute total one, or so as to bar themselves from denying that such a loss has accrued. But when the assured has obtained the benefit of a low premium by covering absolute total loss only, then, in view thereof, and also in view of the fact that public policy requires that all interests should be encouraged to use the sue and labor or rescue clauses to the fullest extent, whatever may be done in that direction by the underwriters, as well as by the owners, in unintentional excess of power, should not be made a trap."

In our view, the sue and labor clause, except so far as it enables the assured to charge the underwriters for the expenses incurred under it, amounts to-day only to what the courts would now declare as a principle of the common law. In determining whether or not the underwriters have made themselves liable for a total loss, when not so liable by the terms of the policy, by reason of their conduct with reference to the property insured, we must look at the circumstances, and judge of them according to the fundamental rules of law. In cases where the underwriters may be holden for a constructive total loss, and the question is simply one of computation, or one of circumstances about which there could be a great variety of opinions or great doubts, slight circumstances may be sufficient to authorize a jury or a court to say that the underwriters have accepted an abandonment.

Many cases occur where the underwriters would not be strictly liable on a final adjustment, but for the interests of themselves, or in order to avoid doubtful litigation, they step in, and by their acts, or expressly, accept an abandonment which perhaps they could not be compelled to accept. In a case of that kind, where the underwriters may be holden for a constructive total loss, very slight circumstances may be taken as evidence that they have accepted an abandonment, because both parties are entitled to know what their respective positions and rights are, and to know it early. Each party has a duty to perform, and so long as there is a question it ought to be determined; and therefore the courts scrutinize closely and critically the conduct of the underwriters, not only for the purpose of determining whether they have actually accepted an abandonment, but also whether they have so conducted themselves that the assured has a right to assume an acceptance.

But in a case where there can be no liability for a constructive total loss, and no abandonment which will be of any value, the case is very different. Such a case requires a clear and strong presumption to induce the court to hold or to allow a jury to hold that the underwriters have voluntarily converted into a total loss a loss which they otherwise would not be liable for, especially when, as in this case, the underwriters have promptly and distinctly notified the assured that they do not accept the abandonment, so that the assured knows the position of the underwriters from the outset.

Therefore, as it appeared in this case that the defendants were liable for nothing except for absolute total loss, that they took that position from the outset, and that they from the outset denied their liability for a total loss, we apply to the case, in the fullest breadth, the extract which we have already read from Monroe v. Insurance Co. We say this independently of the question whether or not the underwriters had a right, under the circumstances, to make the transshipment, and because everything in the case shows that the transshipment, by whomsoever made, was done in good faith, and did not prejudice the owner of the cargo.

Therefore, if the underwriters exceed their rights in the matter, we do not regard it as any evidence of an intention on their part to accept the property; and certainly we cannot regard it as sufficient to enable us to say that the underwriters, by that transaction, against their declared and evident intention, did accept the property and make themselves liable for it as underwriters. Whether they made themselves liable for it as tort feasors is another question, which we have nothing to do with. But, if those authorities are correct which hold that the question of a constructive total loss or an absolute total loss must be judged by the condition of things as it may actually exist at the original port of destination, then the underwriters had a clear right to transship this cargo to protect themselves against the rules which those authorities lay down.

It is said that there was some delay at Key West. We see no evidence of any of such substantial or injurious character as would justify us in not applying the rule stated. We doubt very much whether there was any unreasonable delay; but there was none of an in-

jurious character, and none of which any complaint was made, so far as this case goes, until it came to trial. This matter, with many other matters in the case on both sides, as the federal courts now apply the law of waiver, are in the same basket. If the parties are at issue upon a great leading fact, and conduct their matters with reference to that issue, and make no prompt objection with reference to minor matters, they cannot set minor matters up for the first time when the case comes to trial. The courts are holding more and more liberally to that rule, and it is a just rule, and in every sense a lawful one.

We have also considered what constitutes an absolute total loss. We know the great difference among the authorities touching what constitutes such a loss. Some of them go to the extent of holding that if the property at the intermediate port would not be of sufficient value at the port of final destination to pay the additional charges, including the salvage and the cost of transshipment, this constitutes an absolute total loss.

For the purposes of this case we hold, according to what we believe to be the better principle, that inasmuch as a portion of this cargo—a considerable portion, including the staples, and a very large percentage of the fencing wire—was at Key West, in a condition to be transshipped, and suitable for the purposes for which it was originally intended, although not so suitable as it would have been if it had not been submerged in the sea, there was no absolute total loss. Hugg v. Insurance Co., 7 How. 595, 605, 12 L. Ed. 834.

There is the matter of the differences between the charter of the Cactus and that of the Benjamin Hale. These differences come down to the following items: First, advance freight, $700, which had been paid to the Benjamin Hale, and was not credited on the charter of the Cactus; second, the demurrage at Key West, $175; third, five continuous days for discharging at Velasco, instead of quick dispatch and discharge; fourth, expense of discharging at Velasco, $499.60,—making a total of $1,374.60, besides whatever demurrage there was arising from the insertion of the five continuous days for discharging. We regard all this as among the minor matters which should have been raised at the time, if to be insisted on by the plaintiff. It goes with the other minor matters which cannot be taken advantage of now, not having been insisted on at the time when they occurred. If they had then been insisted on, they could have been easily adjusted by the underwriters. Judgment was rendered for the plaintiff for only that portion of the cargo which was submerged in the sea and not recovered.