## WASHBURN AND MOEN MANUFACTURING COMPANY *v.* RELIANCE MARINE INSURANCE COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST
CIRCUIT.

No. 6. Argued March 15, 16, 1899.—Decided October 15, 1900.

In marine insurance the general rule is firmly established in this court that the insurers are not liable upon memorandum articles except, in case of actual total loss, and that there can be no actual total loss when a cargo of such articles has arrived in whole or in part, in specie, at the port of destination, but only when it is physically destroyed, or its value extinguished by a loss of identity.

In this case the entire cargo was warranted by the memorandum clause free from average unless general, and by a rider, free from particular average, but liable for absolute total loss of a part. Under these provisions the insurers were not liable for a constructive total loss, but only for an actual total loss of the whole, or of a distinct part.

The carrying vessel was stranded, and, having been got off in a shattered condition, was subsequently condemned and sold on libels for salvage; most of the cargo was saved, and reached the port of destination in specie, a portion damaged, and a substantial part wholly uninjured. *Held,* That the owner could not recover for a constructive total loss, nor for an actual total loss of the whole.

No right to abandon existed, and the insurers explicitly refused to accept

the abandonment tendered. If the cargo saved was carried from the port of distress to the port of destination by the insurers, which was denied, this was no more than, by the terms of the policy, they had the right to do without prejudice, and could not be held to amount to an acceptance. The Circuit Court did not err in declining to leave the question of actual total loss of the entire cargo, or the question of acceptance, to the jury.

THIS was an action at law brought in the Superior Court of Massachusetts for the county of Suffolk, and thence removed into the Circuit Court of the United States for the District of Massachusetts, by the Washburn and Moen Manufacturing Company against the Reliance Marine Insurance Company (Limited) of London, England, on a policy of marine insurance taken out, March 15, 1893, in the sum of forty-eight thousand, eight hundred dollars, on a cargo of wire shipped from Boston to Velasco, Texas, on the schooner Benjamin Hale, John Hall, master.

The memorandum clause of the policy ran thus : " MEMORANDUM. It is also agreed that bar, bundle, rod, hoop and sheet iron, wire of all kinds, tin plates, steel, madder, sumac, wickerware and willow (manufactured or otherwise), salt, grain of all kinds, tobacco, Indian meal, fruits (whether preserved or otherwise), cheese, dry fish, hay, vegetables and roots, rags, hempen yarn, bags, cotton bagging, and other articles used for bags or bagging, pleasure carriages, household furniture, skins and hides, musical instruments, looking-glasses, and all other articles that are perishable in their own nature, are warranted by the assured free from average, unless general; hemp, tobacco stems, matting and cassia, except in boxes, free from average under twenty per cent, unless general; and sugar, flax, flaxseed and bread are warranted by the assured free from average under seven per cent, unless general; and coffee in bags or bulk, pepper in bags or bulk, and rice, free from average under ten per cent, unless general."

And on the margin the following was stamped or written : " Free of particular average, but liable for absolute total loss of a part if amounting to five (5%) per cent."

It was also provided : " And in case of any loss or misfortune, it shall be lawful and necessary to and for the assured, their factors, servants and assigns, to sue, labor, and travel for, in

and about the defence, safeguard and recovery of the said goods
and merchandises, or any part thereof, without prejudice to this
insurance; nor shall the acts of the insured or insurers in recov-
ering, saving and preserving the property insured, in case of
disaster, be considered a waiver or an acceptance of an aban-
donment; to the charges whereof, the said assurers will con-
tribute according to the rate and quantity of the sum herein
insured."

The "Benjamin Hale" sailed for Velasco, March 31, 1893, and
on April 15 ran ashore on Bahama Banks, but, after throwing
overboard two hundred reels of barbed wire, floated and pro-
ceeded.  On the night of April 19 the schooner again ran ashore,
on Bird Key, near Dry Tortugas, and largely filled with water.
Wreckers came on board April 21.  The master went to Key
West, and from thence telegraphed the Washburn and Moen
Company, April 24, that the vessel was ashore, and he thought
the loss was total.  April 24, 25 or 26 the agent of that com-
pany told the agent of the insurance company, in Boston, "what
he knew in regard to the troubles, and said that he wished to
abandon the cargo to the underwriters."  April 29 a written
notice of abandonment was given, which the insurance company
explicitly declined to accept.  The master returned at once with
further assistance, reaching the wreck the morning of April 25,
and the vessel was floated April 29, and finally taken to Key
West, arriving May 4.  The captain testified that "from the
time the vessel went ashore until she came off they were taking
the cargo out as they could so as to get her off.  .  .  .  Think
about one half of cargo was discharged on the reef, of which
he thinks about thirteen hundred reels were dry."  This was
substantially all carried to Key West, where the unloading was
completed May 10.

Captain Hall made a memorandum at Key West as to the
condition of the cargo when landed there.  From this it ap-
peared that out of 13,051 reels of barbed wire, shipped from
Boston, 12,277 (or 12,625) were landed at Key West, of which
989 were perfectly dry, and 10,448 had received "hardly per-
ceptible" damage.  Of plain wire, 1102 bundles were shipped,
and all landed at Key West, and 464 were stated to be nearly

dry. Five reels of salamander wire and a wire rope were all landed and transhipped dry and unimpaired; also 243 kegs of staples out of 249 ; and 478 bundles of hay bands out of 1050.

Libels for salvage were filed against vessel and cargo at Key West, and the schooner condemned and sold, but the cargo was released and the amount decreed in respect thereof paid by the insurance company.

The goods were forwarded from Key West to Velasco on the schooner Cactus, where they were tendered to the Washburn and Moen Company, which refused to receive them. That company again abandoned, and the insurance company again declined to accept abandonment.

At this time a very large part of the goods existed in specie, and a considerable part was practically uninjured. There were no facilities for handling and no market for barbed wire at Key West, but there were at Velasco, which was also but sixty miles by rail from Houston, the headquarters of the general agent of the manufacturing company in Texas.

The goods were afterwards sold by order of court on the libel of the master of the Cactus for freight, demurrage and expenses, and realized $10,000. Plaintiff was not present and made no bid at the sale.

As the cost of saving the cargo and bringing it to Key West, and expenses there, exceeded the sum realized at forced sale, and the freight to Velasco added some hundreds of dollars to that, plaintiff contended that the cost was more than the value at Key West, and at Velasco.

In respect of the forwarding of the cargo from Key West to Velasco, the charter party was signed by Captain Hall as master of the Benjamin Hale. This was in Boston several days after Hall had left Key West, but there was evidence that he had previously authorized the agents of the vessel at Key West, and who paid for the discharge of the cargo there, to charter the "Cactus," and the second bill of lading was signed by one of them as attorney in fact for Captain Hall, and stated that the goods were shipped by him.

The agent for the board of underwriters testified that he instructed the agent at Key West to see that a vessel was secured

and the cargo properly shipped to Velasco according to the original bill of lading; that Hall authorized the "Cactus" to be chartered; and that he always insisted that Hall should forward the cargo; while Hall said that he received a request from defendant's agent to so forward.

The Circuit Court ruled that the defendant was not liable for a constructive total loss; that the transhipment of the cargo at Key West, though made by the underwriters as he thought it was, did not, under the circumstances, make them liable for the property as underwriters; and that " inasmuch as a portion of this cargo — a considerable portion, including the staples, and a very large percentage of the fencing wire — was at Key West in a condition to be transhipped, and did in fact arrive at Velasco in specie, and suitable for the purposes for which it was intended, although not so suitable as it would have been if it had not been submerged in the sea," there was no absolute total loss of the whole.

It was agreed that there was an actual total loss of parts of the cargo to the amount of $2500; and that, under the views expressed by the court, plaintiff was entitled to a finding that there was a constructive total loss.

Accordingly a verdict was directed for $2500, and a special verdict " that there was a constructive total loss."

Judgment was rendered in favor of plaintiff, and each party prosecuted a writ of error from the Circuit Court of Appeals.

That court concurred in the rulings of the Circuit Court, but was of opinion that the cargo was forwarded from Key West to Velasco under authority of the captain of the Benjamin Hale. 50 U. S. App. 231.

Judgment having been affirmed, the Washburn and Moen Manufacturing Company applied for and obtained a writ of certiorari from this court.

Errors were relied on by petitioner, in substance, that the Circuit Court erred in not ruling that plaintiff was entitled to recover for a constructive total loss under the policy; and in not allowing the question whether there was an absolute total loss to go to the jury; or the question whether defendant had accepted plaintiff's abandonment of the cargo.

*Mr. Eugene P. Carver* for the Washburn and Moen Manu-
facturing Company. *Mr. Edward E. Blodgett* was on his
brief.

I. The plaintiff can recover for a constructive total loss
under this policy.

There are two rules as to what is a constructive total loss
under a policy of marine insurance. (1) The English rule is
that, in the case of a vessel, if the amount of repairs caused by
perils insured against is more than her value, or in the case of
cargo, if the cost of saving and forwarding the same amounts
to more than the value of the same at the port of destination,
then, if there is an abandonment seasonably made, there can
be a recovery for a total loss. (2) The rule in the United
States in the case of both vessel and cargo is that, if the dam-
age by perils insured against is in excess of one half of the value,
and an abandonment is seasonably made, there is a constructive
total loss.

This doctrine was first laid down in this form in Massachu-
setts in 1810 by Parsons, C. J., in *Wood* v. *Lincoln & Kennebeck
Ins. Co.,* 6 Mass. 479.

It is true that in an early case in regard to the English rule,
*Cocking* v. *Fraser,* 4 Doug. 295, Lord Mansfield said, " abso-
lute destruction of the goods by the wreck of the ship" would
amount to a total loss on articles insured " free of average,"
even at an intermediate port, but this case has been overruled
in England. See 2 Arnold on Insurance, Perkins' ed. 1026.
If, therefore, in the case at bar there were no restrictive clauses,
there could be a recovery for a constructive total loss, as the
abandonment was seasonably made.

The law in the United States, by a long list of decisions re-
lating to both vessel and cargo, has been settled in this regard.
Under the usual form of policy the assured can recover for a
constructive total loss of cargo, provided there has been an
abandonment duly made, if the loss or injury sustained amounts
to fifty per cent of the value fixed in the policy, or provided
the property will not bring fifty per cent of such valuation in
case of cargo. *Kettell* v. *Alliance Ins. Co.,* 10 Gray, 144; *Del-*

*aware Ins. Co.* v. *Winter,* 38 Penn. St. 176; *Patapsco Ins. Co.* v. *Southgate,* 5 Pet. 604; *Moses* v. *Columbian Ins. Co.,* 6 Johns. 219.

In determining the damage or injury to the property, the cost of saving the property, or raising it, if submerged, and bringing into port, will be taken as a part of the damage or injury in order to make up the necessary fifty per cent. *Ellicott* v. *The Alliance Ins. Co.,* 14 Gray, 318; *Wallace* v. *Thames & Mersey Ins. Co.,* 22 Fed. Rep. 66 (by Mr. Justice Matthews, late of U. S. Supreme Court); *Tudor* v. *New England Mutual Marine Ins. Co.,* 12 Cush. 554.

From an examination of the cases it is clear that the cases in the Supreme Court of Massachusetts and in the Supreme Court of the United States are not in conflict, and that the rule established by both of these courts can be thus briefly stated: That if the goods are insured " free of particular average," " free of partial loss," " against total loss only," or " warranted free from average unless general," there can be a recovery for a constructive total loss, provided there is a seasonable abandonment and a loss by perils insured against amounting to more than fifty per cent of the valuation of the goods insured; that in case no abandonment is made until after the goods have arrived at the port of destination, the abandonment is not seasonably made, and the plaintiff cannot recover; that in the case of common memorandum articles, perishable in their own nature, there can be no recovery for deterioration of the articles at a port of call, or by mere delay in the voyage is all that the cases in the Supreme Court of the United States decide, and the court, in its decisions, by express language clearly distinguishes between articles perishable in their own nature and articles not so perishable.

II. It was a question of fact for the jury as to whether on all the evidence the defendant company had not accepted the abandonment.

It is true that the agent of the defendant company, on May 1, 1893, wrote a letter in which he declined to accept the abandonment. He uses, however, these words in addition, " I await protest for particulars, after receipt of which can judge better re-

garding the loss." Which clause shows that he desired to have the matter remain open. An abandonment is to be governed by the facts existing at the time it is made. This doctrine has often been stated by the Supreme Court of the United States. *Orient Ins. Co.* v. *Adams,* 123 U. S. 67.

III. There is sufficient evidence to warrant a jury in finding an actual loss of cargo.

IV. The contract in this case should be governed by the law of Massachusetts.

*Mr. Frederic Jessup Stimson* for the Reliance Marine Insurance Company.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

By the memorandum, wire of all kinds was expressly "warranted by the assured free from average unless general;" and by the rider, "free of particular average but liable for absolute total loss of a part if amounting to five per cent."

The memorandum and marginal clauses were *in pari materia* and to be read together. They were not contradictory, and the rider merely operated to qualify the memorandum by allowing recovery for an actual total loss in part, which could not otherwise be had. In other words, the qualification was manifestly inserted so that, while conceding that under the memorandum clause no liability was undertaken for a constructive total loss, but only a liability for an actual total loss, the insurers might be held for an actual total loss of a part.

The contracting parties thus recognized the rule that articles warranted free of particular average, or free from average unless general, are insured only against an actual total loss.

The warranty or memorandum clause was introduced into policies for the protection of the insurer from liability for any partial loss whatever on certain enumerated articles, regarded as perishable in their nature, and upon certain others none under a given rate per cent. This was about 1749, and since then in the growth of commerce, the list of articles freed by the stipulation from particular average has been enlarged so as to em-

brace many, which, though they may not be inherently perishable, are in their nature peculiarly susceptible to damage.

The early form ran as follows: " Corn, fish, salt, fruit, flour and seed are warranted free from average, unless general or the ship be stranded; sugar, tobacco, hemp, flax, hides and skins are warranted free from average under five pounds per cent; and all other goods, and also the ship and freight, are warranted free from average under three pounds per cent unless general or the ship be stranded."

In 1764, Lord Mansfield, in *Wilson* v. *Smith*, 3 Burrow, 1550, held that the word "unless" meant the same as "except," and that "the words 'free from average *unless general*' can never mean to leave the insurers liable to any *particular* average."

In *Cocking* v. *Fraser*, 4 Douglas, 295 (1785), the Court of King's Bench held, Lord Mansfield and Mr. Justice Buller speaking, that the insurer was secured against all damage to memorandum articles unless they were completely and actually destroyed so as no longer physically to exist.

Chancellor Kent in his Commentaries commended this rule as "very salutary, by reason of its simplicity and certainty," "considering the difficulty of ascertaining how much of the loss arose by the perils of the sea, and how much by the perishable nature of the commodity, and the impositions to which insurers would be liable in consequence of that difficulty;" and declared that notwithstanding the authority of *Cocking* v. *Fraser* had been shaken in England, the weight of authority in this country was "in favor of the doctrine that in order to charge the insurer, the memorandum articles must be specifically and physically destroyed and must not exist in specie." He added, however, that it had been "frequently a vexed point in the discussions, whether the insurer was holden, if the memorandum articles physically existed, though they were absolutely of no value." 3 Kent (1st ed. 1828), 244; 12th ed. *296.

The general rule is firmly established in this court that the insurers are not liable on memorandum articles except in case of actual total loss, and that there can be no actual total loss

where a cargo of such articles has arrived, in whole or in part, in specie, at the port of destination, but only when it is physically destroyed, or its value extinguished by a loss of identity. *Biays* v. *Chesapeake Ins. Co.* (1813), 7 Cranch, 415; *Marcardier* v. *Chesapeake Ins. Co.* (1814), 8 Cranch, 39; *Morean* v. *United States Ins. Co.* (1816), 1 Wheat. 219; *Hugg* v. *Augusta Ins. &c. Co.* (1849), 7 How. 595; *Insurance Co.* v. *Fogarty* (1873), 19 Wall. 640. And see *Robinson* v. *Insurance Co.*, 3 Sumner, 220; *Morean* v. *United States Insurance Co.*, 3 Wash. Cir. Ct. Rep. 256.

*Biays* v. *Chesapeake Ins. Co.* was a case of insurance upon hides, of which some were totally lost; some were saved in a damaged condition; and some were uninjured. This court overruled the contention that there could be a total loss as to some of them, notwithstanding the memorandum clause, and Mr. Justice Livingston said:

"Whatever may have been the motive to the introduction of this clause into policies of insurance, which was done as early as the year 1749, and most probably with the intention of protecting insurers against losses arising solely from a deterioration of the article, by its own perishable quality; or whatever ambiguity may once have existed from the term *average* being used in different senses, that is as signifying *a contribution to a general loss*, and also a *particular or partial injury* falling on the subject insured, it is well understood at the present day, with respect to such [memorandum] articles, that underwriters are free from all partial losses of every kind, which do not arise from a contribution towards a general average.

"It only remains then to examine, and so the question has properly been treated at bar, whether the hides, which were sunk and not reclaimed, constituted a total or partial loss within the meaning of this policy. It has been considered as total by the counsel of the assured, but the court cannot perceive any ground for treating it in that way, inasmuch as out of many thousand hides which were on board, not quite eight hundred were lost, making in point of value somewhat less than one-sixth part of the sum insured by this policy. If there were no memorandum in the way, and the plaintiff had gone on to recover, as

in that case he might have done, it is perceived at once that he must have had judgment only for a partial loss, which would have been equivalent to the injury actually sustained. But without having recourse to any reasoning on the subject, the proposition appears too self-evident not to command universal assent, that when only a part of a cargo, consisting all of the same kind of articles, is lost in any way whatever, and the residue, (which in this case amounts to much the greatest part), arrives in safety at its port of destination, the loss cannot but be partial, and that this must forever be so, as long as a part continues to be less than the whole. This loss then being a particular loss only, and not resulting from a general average, the court is of opinion that the defendants are not liable for it."

In *Marcardier* v. *Chesapeake Ins. Co.*, some of the goods insured were warranted "free from average, unless general," and damages were claimed for a constructive total loss of these goods, but the claim was disallowed. After stating the American rule that a damage of ordinary goods exceeding fifty per cent entitles the insured to recover for a constructive total loss, Mr. Justice Story continued :

"But this rule has never been deemed to extend to a cargo consisting wholly of memorandum articles. The legal effect of the memorandum is to protect the underwriter from all partial losses; and if a loss by deterioration, exceeding a moiety in value, would authorize an abandonment, the great object of the stipulation would be completely evaded. It seems, therefore, to be the settled doctrine that nothing short of a total extinction, either physical or in value, of memorandum articles at an intermediate port, would entitle the insured to turn the case into a total loss, where the voyage is capable of being performed."

In *Robinson* v. *Commonwealth Ins. Co.*, 3 Sumner, 220, where a clause in the policy exempted the insurers from liability for any partial loss on goods esteemed perishable in their own nature, and the goods insured were held to be perishable, the same eminent judge charged the jury :

"The principle of law is very clear, that, as this is an insurance on a perishable cargo, the plaintiff is not entitled to re-

cover, unless there has been a total loss of the cargo by some
peril insured against.   If the schooner had arrived at the port
of destination, with the cargo on board, physically in existence,
the plaintiff would not have been entitled to recover, however
great the damage might have been by a peril insured against,
even if it had been ninety-nine per cent, or in truth even if the
cargo had there been of no real value."

Part of the cargo in *Morean* v. *United States Ins. Co.* was
warranted free from average, unless general, and Mr. Justice
Washington said:

" All considerations connected with the loss of the cargo, in
respect to quantity or value, may, at once, be dismissed from
the case.   As to memorandum articles, the insurer agrees to
pay for a total loss only, the insured taking upon himself all
partial losses without exception.

" If the property arrive at the port of discharge, reduced in
quantity or value, to any amount, the loss cannot be said to be
total in reality, and the insured cannot treat it as a total, and
demand an indemnity for a partial loss.   There is no instance
where the insured can demand as for a total loss that he might
not have declined an abandonment, and demand a partial loss.
But if the property insured be included within the memoran-
dum, he cannot, under any circumstances, call upon the insurer
for a partial loss, and, consequently, he cannot elect to turn it
into a total loss.  .   .   .   The only question that can possibly
arise, in relation to memorandum articles, is, whether the loss
was total or not; and this can never happen where the cargo,
or a part of it, has been sent on by the insured, and reaches
the original port of its destination.   Being there specifically,
the insurer has complied with his engagements; everything
like a promise of indemnity against loss or damage to the cargo
being excluded from the policy."

In *Hugg* v. *Augusta Ins. Co.*, the insurance was upon freight
on a cargo of jerked beef, perishable articles being warranted
free from average, and it was held that defendant was not lia-
ble for a total loss of freight unless it appeared that the entire
cargo was destroyed in specie.   The memorandum clause is

Opinion of the Court.

given in the margin.[1]   Mr. Justice Nelson, delivering the opinion of the court, made these, among other, observations:

"What constitutes a total loss of a memorandum article has been the subject of frequent discussion, both in the courts of England and this country, and in the former of some diversity of opinion; but, in most of the cases, the decisions have been uniform, and the principle governing the question regarded as settled; and that is, so long as the goods have not lost their original character, but remain in specie, and in that condition are capable of being shipped to the destined port, there cannot be a total loss of the article, whatever may be the extent of the damage, so as to subject the underwriter.   The loss is but partial.   .   .   .

"The only doubt that has been expressed in respect to the soundness of this rule is, whether a destruction in value for all the purposes of the adventure, so that the objects of the voyage were no longer worth pursuing, should not be regarded as a total loss within the memorandum clause, as well as a destruction in specie.   .   .   .   In this country the rule has been uniform, that there must be a destruction of the article in specie, as will be seen by a reference to the following authorities.   .   .   .

"Whether the test of liability is made to depend upon the destruction in specie, or in value, would, we are inclined to think, as a general rule, make practically very little, if any, difference; for while the goods remain in specie, and are capable of being carried on in that condition to the destined port, it will rarely happen that on their arrival they will be of no value to the owner or consignee.   The proposition assumes a complete de-

---

[1] "It is also agreed, that bar and sheet iron, wire, tin plates, salt, grain of all kinds, tobacco, Indian meal, fruits, (whether preserved or otherwise), cheese, dry fish, vegetables and roots, hempen yarn, cotton bagging, pleasure carriages, household furniture, furs, skins, and hides, musical instruments, looking-glasses, and all other articles that are perishable in their own nature, are warranted by the assured free from average, unless general; hemp free from average under twenty per cent, unless general; and sugar, flax, flaxseed, and bread are warranted by the assured free from average under seven per cent, unless general; and coffee in bags or bulk, and pepper in bags or bulk, free from average under ten per cent, unless general."

struction in value, otherwise the uncertainty attending it would be an insuperable objection; and, in that view, it may be a question even if the degree of deterioration would not be greater to constitute a total loss than is required under the present rule.

"The rule as settled seems preferable, for its certainty and simplicity, and as affording the best security to the underwriter against the strong temptation that may frequently exist, on the part of the master and shipper, to convert a partial into a total loss."

The case came up on a certificate of division, and the answer to the first question certified was:

"That, if the jury find that the jerked beef was a perishable article within the meaning of the policy, the defendants are not liable as for a total loss of the freight, unless it appears that there was a destruction in specie of the entire cargo, so that it had lost its original character at Nassau, the port of distress; or that a total destruction would have been inevitable from the damage received, if it had been reshipped before it could have arrived at Matanzas, the port of destination."

The cases in this court are reviewed and applied by Mr. Justice Miller in *Insurance Co.* v. *Fogarty,* in which it was ruled that where certain machinery had been so injured as to have lost its identity as such, recovery for total loss might be sustained.

The same conclusion has been announced in many of the state courts. *Brooke* v. *Louisiana Ins. Co.,* 5 Mart. N. S. 530, 535; *Skinner* v. *Western Ins. Co.,* 19 La. *273; *Gould* v. *Louisiana Mut. Ins. Co.,* 20 La. Ann. 259; *Williams* v. *Kennebec Ins. Co.,* 31 Maine, 455; *Waln* v. *Thompson,* 9 Serg. & R. 115; *Willard* v. *Manufacturers' Ins. Co.,* 24 Mo. 561; *Wadsworth* v. *Pacific Ins. Co.,* 4 Wend. 33; *De Peyster* v. *Sun Ins. Co.,* 19 N. Y. 272; *Burt* v. *Brewers' Ins. Co.,* 9 Hun, 383; *S. C.* 78 N. Y. 400; *Chadsey* v. *Guion,* 97 N. Y. 333; *Merchants' S. S. Co.* v. *Commercial Mutual Ins. Co.,* 19 Jones & S. 444; *Curr* v. *Security Ins. Co.,* 109 N. Y. 504.

It is said that a different rule has been laid down in Massachusetts by the Supreme Judicial Court of that Commonwealth. *Kettell* v. *Alliance Ins. Co.,* 10 Gray, 144; *Mayo* v. *India Mut. Ins. Co.,* 152 Mass. 172.

Even if this were absolutely so we should not feel constrained, though regretting the difference of opinion, to depart from our own rule. The policy was a Massachusetts contract, it is true, but its construction depended on questions of general commercial law, in respect of which the courts of the United States are at liberty to exercise their own judgment and are not bound to accept the state decisions as in matters of purely local law.

We are not, however, persuaded that the cases cited justify the asserted conclusion as respects articles specifically included in the memorandum.

In *Kettell* v. *Alliance Ins. Co.*, the memorandum clause of the policy provided that the insurers should not be liable for any partial loss on, among other articles, " salt, grain, fish, fruit, hides, skins, or other goods that are esteemed perishable in their own nature, unless it amount to seven per cent on the whole aggregate value of such articles, and happen by stranding." At the end of the last paragraph of the policy, next before the formal conclusion, were printed these words: " Partial loss on sheet iron, iron wire, brazier's rods, iron hoops and tin plates, is excepted."

The shipment consisted of five hundred boxes of tin plates, invoiced and valued together at one sum. The vessel was wrecked; all the plates damaged more or less; and some of them totally destroyed. Chief Justice Shaw ruled, for the court, that the exception did not come under the memorandum clause; that it recognized a distinction between tin and brass goods liable to tarnish, and memorandum articles liable to decay; and that the natural construction of the exception was " that it leaves the insurer liable for all total losses; but it makes no distinction between absolute and constructive total losses; and in case of a constructive total loss, which gives the assured a right to abandon, and he exercises the right, it becomes a legal total loss, as if absolute in its nature." The insurers were held liable for a constructive total loss under the fifty per cent rule.

In the case before us wire of all kinds was specifically exempted by the memorandum clause, and the exemption was relaxed by the rider in respect of absolute, that is, actual, loss of a part.

If the contract in that case had been in terms and arrangement the same as the contract in this, it does not follow that the same result would have been reached.

But we must not be understood as accepting the views expressed in *Kettell's* case, great as is the weight attaching to the utterances of the distinguished judge who delivered the opinion. We do not think the words, " partial loss excepted," had any other meaning as applied to tin plates than if applied to articles having an inherent tendency to decay. Tin plates may not be perishable in their nature in the sense of liability to corporeal destruction, but their original character as tin plates is perishable by reason of liability to corrosion and rust. And this may explain why the words, " and happen by stranding," were omitted from the exception. It appears to us that the natural meaning of the exception was to exempt the underwriters from liability for an actual partial loss, and, therefore, for a constructive total loss, which involves an actual partial loss, and a remainder transferred by abandonment.

*Mayo* v. *India Ins. Co.*, 152 Mass. 172, follows the prior case, but the court expressly refused to decide " whether in this Commonwealth there can be no total loss of a memorandum article, if any part of it arrives at the port of discharge in specie."

It would subserve no useful purpose to attempt a review of the English cases on this subject. If in England a plaintiff may recover for a constructive total loss of memorandum articles, it is when they are so injured as to be of no substantial value when brought to the port of destination.

In the United States (and herein is a material difference between the jurisprudence of the two countries), the general rule is that a damage exceeding fifty per cent justifies abandonment and recovery as for constructive total loss. *Marcardier* v. *Chesapeake Insurance Company, supra;* Le Guidon (Paris, 1831), chap. VII, art. I ; chap. V, art. VIII. But this principle is not applicable to memorandum articles in respect of which the exception of particular average excludes a constructive total loss.

There is no pretence here that this wire, with some small exceptions duly allowed for, did not exist at Key West and did not arrive at Velasco in specie, and as to a large part with its

original character unimpaired. Abandonment is necessary when the loss is only constructively total, and under this policy no right of abandonment existed at the time of the disaster or afterwards, by the exercise of which the assured could turn this partial loss in fact into a total loss by construction.

The salvage charges at Key West were paid by the underwriters as incurred to avert an impending actual total loss of the whole subject of the insurance. It was to their particular interest, as well as to the general public interest, that the goods should be saved, and it is apparent that plaintiff could not injure their market by refusing to receive them, and then claim that their value was determined by the price they brought at forced sale.

Counsel conceded that the cargo was damaged to an amount exceeding fifty per cent, and that, therefore, there was a constructive total loss according to the American rule applicable to non-memorandum articles. But there was not an actual loss of the whole, and by the memorandum and rider the insurance company was exempted from liability except for the actual loss of a specific part, and for that plaintiff has duly recovered.

The Circuit Court correctly ruled that under the terms of the policy plaintiff could not recover for a constructive total loss of the goods insured; and, inasmuch as a large part of the goods reached Velasco in specie, a substantial part of them being wholly uninjured, was right in declining to permit the jury to pass on the question of actual total loss.

There is nothing taking the case out of the general rule. The forced sale certainly does not affect it.

After some previous jettison the cargo passed through the wreck, and the bulk of the wire, some damaged and much uninjured, arrived at the port of destination.

The consignee, which was also the manufacturer, refused to accept it, and declined to put an end to the proceedings which were instituted to its knowledge. If there had been a constructive total loss and a sufficient abandonment prior to the sale, defendant was then liable. As there was not, and no right to abandon or acceptance of abandonment, the goods were at

plaintiff's risk, and defendant was not responsible for any loss plaintiff sustained by the sale.

But, although, as we have seen, plaintiff had no right to abandon, and although defendant specifically refused to accept an abandonment, it is contended that defendant transhipped the wire, and that such transhipment amounted to an acceptance of abandonment.

The Circuit Court of Appeals was of opinion that the forwarding from Key West to Velasco was done under the authority and with the approval of the captain of the "Benjamin Hale." As the cargo was in a condition for transhipment, and there was opportunity to effect it, defendant rightfully insisted that it was the duty of the master to forward it to the destined port.

Yet even if the underwriters chartered the "Cactus" and forwarded the cargo, we agree with both courts that neither that nor any other act disclosed by the evidence would have authorized the jury to find that defendant had accepted the attempted cession of the cargo.

The sue and labor clause expressly provided that acts of the insurer in recovering, saving and preserving the property insured, in case of disaster, were not to be considered an acceptance of abandonment. Whether regarded as embodying a common-law principle, or as new in itself, the clause must receive a liberal application, for the public interest requires both insured and insurer to labor for the preservation of the property. And to that end provision is made that this may be done without prejudice.

The Circuit Court of Appeal well points out that at Key West there was no agent of the assured; no adequate means of protection, and no market; while at Velasco there were excellent facilities for protection and handling of cargo; easy access to the company's head agency; and a good market; and it was the port of destination.

If then it was the insurer that carried the property, to be preserved and carried, to Velasco, where it was offered to the consignees, such labor and care rendered in good faith did not operate as an acceptance of abandonment, and especially as there was no right to abandon and a distinct refusal to accept.

Acts of the insurer are sometimes construed as an acceptance, when the intention to accept is fairly deducible from particular conduct, in the absence of explicit refusal. Silence may give rise to ambiguity solvable by acts performed. Here, however, defendant refused to accept, and there was no ambiguity in its attitude; and what was done, if done by it, was no more than it had the right to do without incurring a liability expressly disavowed. There was nothing to be left to the jury on this branch of the case.

Some further suggestions are made, but they call for no particular consideration.

*Judgment affirmed.*