NORTHWESTERN TRANSP. CO. *v.* CONTINENTAL INS. CO.

*(Circuit Court, E. D. Michigan.  June 8, 1885.)*

1. GENERAL AVERAGE—STRANDING—REPAIRS.
   Repairs to a ship, rendered necessary by a voluntary stranding, are the subject of a general average contribution, and are a charge upon underwriters who have insured the ship against total loss and general average.

2. MARINE INSURANCE—STRANDED AND ABANDONED VESSEL—REPAIRS.
   A ship which had been voluntarily stranded and abandoned to the underwriters, was raised by them and tendered back to the owner without being repaired, and without an offer to pay the expense of the repairs rendered necessary by the stranding. *Held*, that the owner was under no obligation to receive her, and that the underwriters must be deemed, as matter of law, to have accepted the abandonment.

3. SAME—RIGHTS OF UNDERWRITERS.

    When an insured vessel is stranded and abandoned, there are three courses open to the underwriters: they may accept the abandonment and pay for a total loss; they may allow the vessel to lie on the beach and contest the owner's right to abandon; or they may elect to raise and repair her, and if they can do this for less than half her valuation, they may return her to her owner and thus avoid paying a total loss; but in so doing they must act promptly, that the owner may be repossessed of his property without unnecessary delay.

4. SAME—VESSEL SUBJECT TO MORTGAGE—WRITTEN ABANDONMENT.

    A stranded vessel owned by a corporation was abandoned to the underwriters by an instrument in writing, signed by the president of the corporation, who, at the same time, held a mortgage upon her in his individual capacity. *Held*, that as he would be estopped to set up the mortgage against the underwriters, the abandonment conveyed to and vested in them " an unincumbered and perfect title to the subject abandoned."

    On Motion for a New Trial.

    This was an action upon a policy of insurance upon the steamer Manitoba, whereby the plaintiff was insured in the sum of $10,000 against total loss and general average only. On the sixth of November, 1883, the steamer left Port Arthur upon Lake Superior, bound for Sarnia, and in the course of her voyage reached the harbor of Southhampton on Lake Huron, November 11th. The wind was then blowing from the south-west. On arriving at the harbor she bore toward the north breakwater, got out her moorings, and laid along-side of the breakwater. About half past 5 o'clock the wind suddenly veered to the north-west, and came down in a terrific gale, which increased to a hurricane, and caused the steamer to part her moorings and drift into the harbor. Both her anchors were dropped and the cable of the small anchor parted. The steamer then dragged her large anchor with full scope of chain, and dropped away to leeward, and, with the aid of her engines, was held from going on the beach till about 4 o'clock the next morning, when her large anchor-chain parted. She was then run inside the breakwater, and, to save her from going ashore, the end of her large hawser was gotten out to a snubbing-post, which, however, snapped and was carried away at once. All her lines were then gotten out on her starboard side and made fast to piles, which held the steamer for about an hour and a half, when a terrific blast from the north-west struck her with such force as to part her lines and tear away her starboard side and stanchions from her gang to her stern. To save her from being totally wrecked and lost the steamer was then voluntarily stranded on the inside of Chantry island.

    So fierce was the storm that it threatened to carry the steamer away from the place where she was stranded, and the full force of her engines was needed to keep her from drifting off. The storm continued, with but little intermission, for about eight days. To prevent greater loss and damage to the steamer from pounding on the gravel bottom, she was scuttled where she was stranded. The place was rocky and dangerous, and she suffered large damages by reason of pounding and rolling upon the rocks and boulders after she was

stranded. On or about the thirteenth of November, the passengers, to the number of 16, were removed. The steamer was without cargo, except 160 barrels of salt fish, which had been taken on board at some port on Lake Superior, and which were also removed at the same time, and landed at Southhampton. The steamer was unable to free herself, and the assistance of a wrecking-tug and steam-pumps was required for the purpose. Efforts were made as promptly as possible by the plaintiff to rescue and care for the steamer, and considerable expense was incurred in such undertaking.

The underwriters were immediately notified of the stranding of the steamer, and sent their agent with a wrecking-tug and pumps for the purpose of relieving her. Upon the arrival of the insurance agent, he co-operated with the master of the steamer in the work of attempting to rescue her, and continued his efforts in co-operation with the master and crew of the steamer, until about the thirtieth of November, when he left her, and informed the plaintiff of his intention of leaving her in her then stranded situation until the next spring. The steamer was left there until about the first of June, when she was finally gotten off by the aid of certain tugs, steam-pumps, and pontoons employed by the underwriters, and brought to the port of Detroit, where she was still lying in a wrecked and damaged condition till after the commencement of suit. The steamer was valued in her policies at $36,000; and was insured at the time of her loss in the sum of $30,850.

The above facts were all stipulated in writing. Upon the trial of the case it was shown that no offer was made by the insurance companies to repair the damages suffered in consequence of the voluntary stranding, or to pay the cost of such repairs, but she was tendered back to the plaintiff in her damaged condition after she had been repaired sufficiently to keep her afloat. On the thirteenth of December, and after the efforts to rescue the steamer that season had ceased, Mr. Beatty, the president of the plaintiff corporation, after protesting against her being left on the beach during the winter, addressed to each of the insurance companies the following letter:

"NORTHWESTERN TRANSPORTATION COMPANY, (LIMITED.)

"SARNIA, December 13, 1883.

"DEAR SIR. The steamer Manitoba, of the Northwest Transportation Company, (Limited,) was insured in your company in May last against total loss and general average, fire clause exempted. She had to be beached in the harbor of Southhampton during the storm of the eleventh and twelfth of November, or in the morning of the 12th, and still remains there, during which time efforts had been made to take her off but without success. Before Mr. Riordon, your general agent, left for another wreck, he advised me of his intention to leave the steamer Manitoba there until spring. To this I gave my distinct refusal, stating that she must be got off this fall, and that I was prepared to pay my proportion of the expense. An offer was obtained from Mr. Murphy, of Detroit, that he would furnish a complete outfit for taking the steamer off for $500 per day, or $10,000 under a guaranty to take

her off or no pay, which offer was refused by your agent; and ordered the steamer to be laid up in opposition to my instructions to proceed and take the steamer off. Regarding her as a wreck I accordingly abandoned her to the insurance companies' agents, and now notify you that I have abandoned the steamer to you.        Yours truly,        JAMES H. BEATTY,
"Pres. N. W. Trans. Co. (Limited.)"

There was also testimony tending to show that there was a mortgage on this vessel given July 14, 1884, to James H. Beatty, president of the company, which was still outstanding and unpaid, to the amount of about $70,000, at the time the proofs of loss were served.

The court directed a verdict for the plaintiff for the full amount of the policy, and thereupon defendant moved for a new trial.

*Moore & Canfield,* for plaintiff.

*Maynard & Swan,* for defendant.

BROWN, J. Defendant insured the Manitoba against total loss and general average. The stipulation expressly shows that the steamer was voluntarily stranded on Chantry island to save her from total loss. The liability of the defendant for its proportion of the general average expenses incurred by reason of the stranding was admitted, but it was assumed that such liability was limited to the cost of getting her off, taking her to Detroit, and to such repairs as were necessary to keep her afloat. The insurers having performed this much of their undertaking, she was surveyed and tendered back to her owners. No offer was made to repair the damages occasioned by her stranding, or to pay the cost of such repairs; the company taking the ground that all permanent repairs were a particular average, for which, under their policy, there was no liability. There was no attempt made to separate the damages received before the stranding, which consisted of the loss of "her mooring lines, and the tearing away of her starboard side and stanchions from her gang to her stern," from the much more serious damage she incurred by her being "scuttled, and pounding and rolling upon the rocks and boulders," after she was run ashore.

Repairs rendered necessary by a peril of the sea are ordinarily treated as a particular average, for which the companies would not be liable under a policy of this description; but where a vessel has been voluntarily run ashore to save her from a total loss, we understand that all the damages thereby occasioned, including the expense of repairs as well as of getting her off, are the subject of a general average contribution. We have considered the case of *Fowler* v. *Rathbones,* 12 Wall. 102, as decisive of this point.

The testimony in this case tended strongly to show that the expense of relieving and repairing this steamer would have exceeded 50 per cent. of her value, and hence that the insured had the right to abandon her, except so far as such right might be restricted by the particular terms of the policy, providing "that the insured shall not have the right to abandon the vessel, in any case, unless the amount which

the insurers would be liable to pay under an adjustment as of a *partial* loss, shall exceed half the amount insured." A similar clause was construed by Mr. Justice MATTHEWS, in *Wallace* v. *Thames & Mersey Ins. Co.* 22 FED. REP. 66, to authorize the owners to abandon when the amount of the repairs, (less one-third new for old,) added to the expense of raising the vessel and taking her to a port of safety, exceeded half her agreed value. This, however, was said in a case where the vessel was accidentally stranded and wrecked by a peril of the sea, and the decision was put upon the ground that the expense of getting her off was not strictly general average. If the same rule were applied to a case of voluntary stranding, the right of the owner in this case to abandon would be clear; but we are inclined to think that this case falls rather within the ruling of *Reynolds* v. *Ocean Ins. Co.* 22 Pick. 197, recognized by Judge MATTHEWS, in which it was held that where a vessel is *voluntarily* stranded, the expense incurred in getting her off was to be considered as coming within the principle of general average, and to be adjusted as a general average, and not as a partial loss; and hence that the same could not be included in the estimate of damage in determining whether the insured was authorized to abandon.

We do not find it necessary, however, to express a decided opinion upon this point, as the right of the plaintiff to recover as for a total loss was put upon the ground that defendant, by its conduct, was shown to have accepted the abandonment, and is, therefore, precluded from insisting that the circumstances were not such as authorized the plaintiff to abandon. There is no doubt that an underwriter may, by his conduct, make himself liable for a constructive total loss when there is no right to abandon, and no intent on his part to accept the abandonment, and even an express refusal to accept it. If he takes possession of the vessel for the purpose of raising, repairing, and returning her to the owner, he is bound to proceed with diligence. Thus, in *Copelin* v. *Insurance Co.* 9 Wall. 461, the underwriter took possession of the vessel to raise and repair her, but did not tender her back to the owner for more than six months after she was injured, nor make the repairs so thorough as to amount to a complete indemnity. Mr. Justice STRONG, speaking for the court, said:

"In holding longer than was necessary for making repairs, they must be regarded as acting not as insurers, but as owners; for they had no other authority than that of owners for their failure to return within a reasonable time. Their action was, therefore, a substantial recognition and acceptance of the abandonment of which they had been notified, for in no other way had they become owners. On no other theory can this delay be considered lawful."

See, also, *Peele* v. *Suffolk Ins. Co.* 7 Pick. 254; *Reynolds* v. *Ocean Ins. Co.* 1 Metc. 160; *Norton* v. *Lexington Ins. Co.* 16 Ill. 235; *Younger* v. *Gloucester Marine Ins. Co.* 1 Spr. 236; S. C. 2 Curt. 322; *Provincial Ins. Co.* v. *Leduc*, L. R. 6 P. C. 224.

Counsel for defendant distinguished these cases from the one under consideration in the fact that the underwriters took possession of the vessel for the declared purpose of raising and *repairing* her, before restoring her to the owners, while in this case it is claimed there is no evidence of an intention to repair, the companies undertaking only to raise her, and then tender her back to the plaintiff. But if it be once established that the companies were bound to repair or pay the expense of repairing, the damages occasioned by the voluntary stranding, we think that, having taken possession of the vessel for the purpose of raising her and tendering her to her owners, they were bound to go on and complete their undertaking. As observed by Mr. Justice MILLER, in *Copeland* v. *Security Ins. Co.* Wool. 289: "The conditions of these policies, supported by the law, require that the vessel, when tendered, should have been in such a condition that the plaintiff, when receiving her, should have full indemnity for all the injury which was covered by the policy." In that case the vessel was insufficiently repaired, and it was insisted by the defendant that, inasmuch as the plaintiff did not point out to them the defects, he was bound to receive the boat, make the necessary repairs, and look to a future action at law to reimburse him the expenses; at all events, that he could not recover the full value of the vessel by refusing to receive her, until he did point out the deficiencies of which he complained, and give the defendant an opportunity to supply them; but the court held the plaintiff justified in refusing to receive the vessel. The claim in this case is substantially the same, viz., that the plaintiff was bound to receive back the vessel when tendered, and look to an action at law against the company to reimburse it for the expense of repairs. But if the underwriter may not tender her back imperfectly repaired, may he make such tender after she is gotten off and temporarily repaired? We think not. Having taken possession of her under an obligation to indemnify the owner for the entire loss occasioned by the voluntary stranding, we think the company must be conclusively presumed to have acted with the intention of doing their whole duty in that regard, and that they cannot discharge themselves of any portion of their obligation. Had the stranding been accidental, and the repairs a particular average, (and this was evidently the assumption of the companies,) the plaintiff might have been bound to take the vessel back; but, under the circumstances, the tender could not be made without at least an offer to pay the cost of such repairs as were rendered necessary by her stranding.

It is true that in the Massachusetts cases the court found that the underwriter took possession with the intention of raising, *repairing*, and restoring the vessel to the owners, but this intention only became material, if at all, by reason of the clause in the policy that the acts of the insurers in recovering, saving, and preserving the property insured should not of themselves be considered, as it had formerly been, an acceptance of the abandonment; the courts adding the proviso

that due diligence be used in this connection. A reference to the cases in the order of their date is instructive as showing the origin of the clause in question. The earliest cases arose out of the wreck of the Argonaut, in March, 1821. In this case the ship went upon the rocks, suffered much damage, and was abandoned to the insurers. The companies caused the vessel to be taken from the rocks, and, having made certain repairs on her, offered to restore her to the plaintiffs. The plaintiffs contended that the vessel had not been sufficiently repaired, nor within a reasonable time, and the expense of the repairs would exceed 50 per cent. of her value. One of the companies was sued by libel on the admiralty side of the district court of Massachusetts; another was sued in the state court. In the first case, (*Peele* v. *Merchants' Ins. Co.* 3 Mason, 27,) Mr. Justice STORY held—*First*, that the owners had the right to abandon under the circumstances, even if the injury was less than half the value. *Second*, that in estimating the half value there was not to be a deduction of one-third new for old, as in case of partial loss; that the half value which authorized an abandonment was half the sum which the ship, if repaired, would be worth, after repairs made. *Third*, that the underwriters had no right to take possession of the ship either to move her or to repair her, without the consent of the owners; that these acts of taking possession, etc., after the abandonment, were, in point of law, an acceptance of the abandonment, since the underwriters could not be justified in them, except as owners of the property. In the other case, (*Peele* v. *Suffolk Ins. Co.* 7 Pick. 254,) against another company, the supreme court of Massachusetts held that the underwriter might take possession of the ship, and repair her, and if the repairs were made for less than half the value, might restore her to the assured; but unless the repairs were made within a reasonable time, the insurer forfeited his right to return her and should be considered as having accepted the abandonment.

In consequence of the decision of Mr. Justice STORY, the policies were amended so as to provide that the acts of the insured or insurers in recovering, saving, and preserving the property should not be considered a waiver or acceptance of the abandonment; and that the insured should not have the right to abandon in any case, unless the amount which the insurers would be liable to pay, under an adjustment as of a *partial* loss, should exceed half the amount insured. The effect of the first amendment was considered by Mr. Justice SHAW in the case of *Reynolds* v. *Ocean Ins. Co.*, which was twice before the supreme court of Massachusetts, reported in 22 Pick. 191, and 1 Metc. 160. It was argued in this case that whether the acts done by the insurers towards saving the property were done promptly and actively, or tardily and negligently, could make no difference; and that, whatever was the character of such acts, they were protected by the policy from being regarded as evidence of an acceptance of the abandonment. "Supposing this view to be correct, still taking possession

of the vessel for another and distinct purpose, is not within this provision in the policy. The act is qualified by the intent and purpose with which it is done. If done solely with a view to save the property, the underwriters were at liberty to do such acts or not as they should see fit, and do them in their own time. If done with the intent to repair and restore the vessel, then it was to be done with reasonable diligence and dispatch, on peril of making the vessel their own, by taking her into custody." The learned judge here appears to make a distinction between acts done with the view simply to save the property, and similar acts done with the view, not only of saving the property, but of restoring it to the owners. The language used in this opinion is not entirely clear. There could be no other purpose in getting the vessel off except "to save the property." If done to save the property for *themselves*, and the property is actually taken by the underwriters, they would undoubtedly be held to have accepted the abandonment. If done to save it for the *owner*, they are equally liable, unless they proceed with diligence. In this view we find it difficult to perceive how the intent with which the act is done can be decisive of the rights of the parties. We should say that they would depend rather upon what was actually done than upon the intent with which it was done.

The whole law upon the subject may be summed up as follows: When an insured vessel is stranded and abandoned there are three courses open to the underwriters: They may accept the abandonment and pay for a total loss; they may allow the vessel to lie on the beach, and insist that there was no right to abandon; or they may elect to raise and repair her, (if bound to repair,) and if they can do this for less than half her valuation, they may return her to the owners and thus avoid paying for a total loss; but in so doing they must act promptly, that the owners may be repossessed of their property without unnecessary delay. *Marmaud* v. *Melledge*, 123 Mass. 176.

The object of the clause in the policy was to prevent the mere act of taking possession and rescuing the property being treated as, *ipso facto*, an acceptance of the abandonment. The companies wished to reserve the right to raise, repair, and restore the vessel within a reasonable time. But in the *Peele Case* it was held that they were not at liberty to touch her in any way without being held as accepting the abandonment. The policies now not only give them the right to interpose to recover the vessel, but in case the owner should do this, and then refuse to repair, the underwriters may then, after recovery, cause the same to be repaired for account of the insured; but, having once made their election to raise the vessel, we do not understand that they are at liberty to stop short of full performance, or to tender her back to the owners without complete indemnity for the loss. In this view of the law, as the facts herein stated were undisputed, there was no question for the jury, and they were properly instructed to re-

turn a verdict for the plaintiff.  *Peele* v. *Merchants' Ins. Co.* 3 Mason, 27.

Certain exceptions were taken to the form of the abandonment, which, we think, are untenable.  The policy requires the abandonment to be in writing, signed by the insured, and delivered to the company; and that it shall be efficient, if accepted, to convey to and vest in the insurers an unincumbered and perfect title to the subject abandoned.  The abandonment in this case is contained in the letter of December 13th, signed by the president of the plaintiff corporation.  Under the circumstances, we think this act was within the scope of his authority, and that his signature as president indicates sufficiently that it was the act of the corporation.  It is true, the president held a mortgage upon the steamer, in his individual capacity, and that the title of the plaintiff was incumbered to the extent of this mortgage at the time the abandonment was made; but we think that Mr. Beatty, in signing the abandonment as president, would be estopped to set up his individual mortgage against the insurance company.  Herm. Chat. Mortg. 355; *Hayes* v. *Livingston*, 34 Mich. 387; *Dann* v. *Cudney*, 13 Mich. 239; *Truesdail* v. *Ward*, 24 Mich. 117; *Meister* v. *Birney*, Id. 435.

The motion for a new trial must be denied.